1
2
3
4
5
6
7
8               UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   VALERIANO SAUCEDO,                    No.  1:22-cv-01584-ADA-HBK

12              Plaintiff,                  ORDER GRANTING MOTION TO COMPEL
                                           ARBITRATION AND STAY ACTION
13       v.
                                           (ECF No. 17)
14   EXPERIAN INFORMATION
     SOLUTIONS, INC.,
15
                Defendant.
16

17       This matter is before the Court on Defendant Experian Information Solutions, Inc.'s

18   ("Defendant") motion to compel arbitration and stay action.  (ECF No. 17.)  For the reasons

19   explained below, the Court grants Defendant's motion.

20                                  **BACKGROUND**

21   **A.  Procedural History**

22       This action arises from Defendant's alleged ongoing violations of the Fair Credit Reporting

23   Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*, where Defendant allegedly refused to correct false

24   information in consumer credit reports and allegedly failed to reasonably investigate consumer

25   complaints regarding such false information.  (ECF No. 1 at ¶ 1.)  Plaintiff Valeriano Saucedo

26   ("Plaintiff") is a natural person and citizen of the State of California.  (*Id.* at ¶ 2.)  Defendant is a

27   "nationwide consumer reporting agency," ("NCRA") incorporated in Ohio and registered to do

28   business in the State of California.  (*Id.* at ¶ 3.)  On December 8, 2022, Plaintiff filed a complaint.

(*See* ECF No. 1.)   The complaint asserts claims for FCRA violations, California Business & Professions Code § 17200, *et seq.* violations, and unjust enrichment claims against Defendant.  (*See id.*)  On February 22, 2023, Defendant filed a motion to compel arbitration.[1]  (ECF No. 17.)  On March 7, 2023, Plaintiff filed an opposition, and Defendant filed a reply on March 17, 2023.  (ECF Nos. 20, 21.)  On April 25, 2023, Defendant filed a notice of supplemental authority in support of its motion to compel.  (ECF No. 22.)

### B. Factual Background

The following facts are discernable from Plaintiff's complaint.  (ECF No. 1.)  The FCRA regulates Defendant, and Defendant failed to follow reasonable procedures to assure maximum possible accuracy of the information in consumer credit reports.  (*Id.* at ¶ 9.)  Credit reporting errors have increased in number, particularly during the coronavirus crisis and economic downturn, which have reduced consumers' credit scores.  (*Id.* at ¶¶ 10, 11.)  NCRAs, including Defendant, have become less responsive to complaints regarding credit reporting errors, even though the amount of complaints has at least doubled each year in 2019, 2020, and 2021.  (*Id.* at ¶ 13, 14.)  NCRAs have been discarding millions of disputed submissions without conducting investigations because they suspected that unauthorized third parties were involved in such complaints.  (*Id.* at ¶ 15.)  Although some of the discarded complaints were likely illegitimate due to third party involvement, NCRAs' process in discarding the complaints employs vague criteria: "envelope characteristics," "attachment characteristics," and "letter characteristics."  (*Id.* at ¶ 16.)  Such process dismisses legitimate complaints without further investigation.  (*Id.* at ¶ 17.)

Defendant, including other NCRAs, reduced the number of investigations by designating data furnishers to accurately report consumer data.  (*Id.* at ¶ 18.)  Upon a referral of a complaint, data furnishers conduct their own investigation of the complaint and report the result back to the NCRA.  (*Id.*)  However, the investigation conducts only "pro forma, perfunctory investigations," ignoring the complaints' attachments.  (*Id.*)  Relying on data finishers to conduct their investigations, NCRAs fail to comply with their duty to investigate consumer disputes.  (*Id.* at ¶

---

[1] On February 15, 2023, Defendant withdrew its January 31, 2023, motion to compel because Defendant had inadvertently based its motion on the enrollment data of Plaintiff's son, who shares the same name as Plaintiff and who also is a CreditWorks member.

20.)   In contrast to before the coronavirus pandemic, most disputes did not result in relief for consumers during the coronavirus pandemic.   (*Id.* at ¶ 23.)   In 2019, approximately 25% of complaints resulted in relief whereas only 4.1% of complaints resulted in relief in 2021.   (*Id.*)   As a result of unresolved complaints, many consumers spend hours of their leisure time monitoring their accounts, communicating with financial institutions and government entities, and conducting other measures to correct false information on their credit histories.   (*Id.* at ¶ 29.)

With respect to Plaintiff's personal experience, around July 2022, Plaintiff received notice of Flagstar Bank's 2021 data breach, and Plaintiff had previously refinanced a real estate transaction with Flagstar Bank.   (*Id.* at ¶ 32.)   At that time, Plaintiff discovered inaccurate information on his consumer credit report, including fraudulent financial transactions made with his information.   (*Id.*)   Plaintiff then hired Kroll Associates ("Kroll"), an identity theft protection service, to correct the information and filed a police report detailing the fraudulent use of his personal information in a bank transaction.   (*Id.* at ¶ 33.)   Kroll then submitted disputes to NCRAs, including Defendant.   (*Id.* at ¶ 34.)   In November 2022, Plaintiff received a "Dispute Results" letter from Defendant, where Defendant failed to remove the incorrect address from Plaintiff's credit report.   (*Id.* at ¶ 35.)   Defendant listed the incorrect address under "Your Personal Information" in the credit report and the incorrect social security number.   (*Id.*)   Afterwards, Plaintiff has spent time dealing with the consequences of Defendant's failure to comply with the FCRA.   (*Id.* at ¶ 37.)

### C.  The Arbitration Agreement

Defendant Experian Information Solutions, Inc. ("EIS") is an affiliate of ConsumerInfo.com, Inc. ("CIC").   (ECF No. 17-2 at ¶¶ 1, 2.)   CIC also does business as Experian Consumer Services ("ECS").   (*Id.*)   CIC/ECS and EIS are both wholly owned subsidiaries of Experian Holdings, Inc., and the parent company is Experian plc.   (*Id.* at ¶ 2.)   CreditWorks is a credit monitoring service with CIC.   (ECF No. 17-1 at 6-7.)   On January 17, 2023, Plaintiff enrolled in CreditWorks, which required completing a single webform with Plaintiff's personal information.   (ECF No. 17-2 at ¶ 3.)   Afterwards, Plaintiff had to click the "Create Your Account" button on the webform to enroll.   (*Id.*)

The phrase "Terms of Use Agreement" in the disclosure was off set in blue text and, if

clicked, would have presented the consumer with the full text of the agreement.  (ECF No. 17-2 at

¶ 4.)  That is, the phrase "Terms of Use Agreement" in the disclosure was a full text hyperlink to

the Terms of Use.  (*Id.*)  Thus, before clicking the "Create Your Account" button, the consumer

could view the entire text of the Terms of Use Agreement by clicking on the blue-highlighted

hyperlink "Terms of Use Agreement."  (*Id.*)  When a consumer clicked on the "Terms of Use

Agreement" hyperlink, an additional window would open within the consumer's web browser

containing the entire text of the Terms of Use Agreement.  (*Id.*)  Immediately below the disclosure

was a large purple button that reads: "Create Your Account."  (*Id.*)  The webform, the disclosure,

and the "Create Your Account" button appeared on a single webpage.  (*Id.*)  Immediately below

the boxes where Plaintiff would have entered his personal information was the following

disclosure: "By clicking 'Create Your Account': I accept and agree to your Terms of Use

Agreement, as well as acknowledge receipt of your Privacy Policy."  (*Id.*)  After entering his

information, Plaintiff clicked the "Create Your Account" button, thereby accepting and agreeing to

the Terms of Use Agreement.  (*Id.* at ¶ 5.)  Plaintiff would not have been able to successfully enroll

in CreditWorks unless he clicked that button.  (*Id.*)

The "Dispute Resolution by Binding Arbitration" section ("Arbitration Agreement") in the

Terms of Use provides:

> ECS and you agree to arbitrate all disputes and claims between us arising out of
> or relating to this Agreement to the maximum extent permitted by law, except
> any disputes or claims which under governing law are not subject to arbitration.
> This agreement to arbitrate is intended to be broadly interpreted and to make all
> disputes and claims between us directly relating to the provision of any Service
> and/or your use of any Website subject to arbitration to the fullest extent
> permitted by law. The agreement to arbitrate includes, but is not limited to:
>
> Claims arising out of or relating to any aspect of the relationship between us
> arising out of any Service or Website, whether based in contract, tort, statute
> (including, without limitation, the Credit Repair Organizations Act) fraud,
> misrepresentation or any other legal theory; claims that arose before this or any
> prior Agreement . . . ; claims that are currently the subject of purported class
> action litigation in which you are not a member of a certified class; and claims
> that may arise after the termination of this Agreement. . . .
>
> For purposes of this arbitration provision, references to "ECS," "you," and "us"

4

shall include our respective parent entities, subsidiaries, affiliates (including, without limitation, our service providers) . . . .

All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable. However if putative class or representative claims are initially brought by either party in a court of law, and a motion to compel arbitration is brought by any party, then the court shall have the power to decide whether this agreement permits class or representative proceedings. . . .

YOU AND ECS AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.

(ECF No. 17-2 at 14-16.)

## LEGAL STANDARDS

### A. Motion to Compel Arbitration

The Federal Arbitration Act ("FAA") governs arbitration agreements and affords parties the right to obtain an order directing arbitration to proceed in the manner provided for in the agreement. 9 U.S.C. §§ 2, 4. The operative provision of the FAA states: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4." 9 U.S.C. § 2. The Court has "described this provision as reflecting both a 'liberal federal policy favoring arbitration,' [citation], and the 'fundamental principle that arbitration is a matter of contract,' [citation]. . . The final phrase of § 2, however, permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract.' This saving clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by

defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). Accordingly, courts may not apply traditional contractual defenses, like duress and unconscionability, in a broader or more stringent manner to invalidate arbitration agreements and thereby undermine FAA's purpose to "ensur[e] that private arbitration agreements are enforced according to their terms." *Id.* at 344 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).

To decide a motion to compel arbitration, the Court must determine: "(1) whether a valid agreement to arbitrate exists [within the contract] and, if it does, (2) whether the agreement encompasses the dispute at issue." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1017 (9th Cir. 2016) (brackets in original)). "Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations." *AT&T Mobility LLC*, 563 U.S. at 351. "[C]ourts must place arbitration agreements on an equal footing with other contracts, [citation], and enforce them according to their terms." *Id.* at 339. The Court should order arbitration of a dispute only where neither the agreement's formation nor enforceability or applicability to the dispute is in issue. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299-300 (2010). "Where a party contests either or both matters, 'the court' must resolve the disagreement" because "'[[a]] party cannot be required to submit to arbitration any dispute [it] has not agreed [to].'" *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (internal citations omitted).

## ANALYSIS

### A.  A valid arbitration agreement exists between Plaintiff and Defendant.

Defendant argues that the parties entered a valid arbitration agreement because Plaintiff (1) had clear notice of the Terms of Use Agreement at the time he enrolled; (2) was admonished that, by clicking an adjacent button, he was agreeing to be bound by the Terms of Use Agreement; and (3) clicked the button, thereby manifesting his assent to the Terms of Use Agreement. (ECF No. 17-1 at 11.) When an arbitration provision, by "clear and unmistakable evidence," contains a valid delegation clause, the Court's inquiry is limited to the first step: whether a valid agreement to arbitrate exists. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 129 S. Ct. 524, 530 (2019). The

dispute as to whether the parties are bound by a given arbitration clause is for the Court to decide. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

In deciding whether parties have agreed to arbitrate, courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). Mutual assent is required for contract formation. *Knutson*, 771 F.3d at 565. Written or spoken words or conduct may manifest mutual assent, and action or inaction may imply acceptance of contract terms. *Id.* "Thus, 'an offeree, knowing that an offer has been made to him but not knowing all of its terms, may be held to have accepted, by his conduct, whatever terms the offer contains.'" *Id.* (quoting *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 991 (1972)). The Court must determine whether a reasonable person would believe that an offeree has assented to an agreement based on his outward manifestations of consent. *Id.* However, "[a]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Id.* at 566 (quoting *Windsor Mills*, 25 Cal. App. 3d at 993).

Contracts formed over the Internet generally fall into two categories: (1) "'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use"; and (2) "'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Nguyen*, 763 F.3d at 1175-75. These two categories fall on two ends of a spectrum; courts routinely find clickwrap agreements enforceable but are generally more reluctant to enforce browsewrap agreements. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). Moreover, "[o]ften websites present some hybrid of the two, such as putting a link to the terms of the agreement on the page, sometimes near a button the user must click to continue." *Berman v. Freedom Fin. Network*, *LLC*, No. 18-cv-01060-YGR, 2020 WL 5210912, at *2 (N.D. Cal. Sept. 1, 2020), *aff'd* 30 F.4th 849 (9th Cir. 2022). To address this evolving spectrum, the analytical framework for contract formation over the Internet is summarized as follows:

> Unless the website operator can show that a consumer has actual knowledge of
> the agreement, an enforceable contract will be found based on an inquiry notice
> theory only if: (1) the website provides reasonably conspicuous notice of the
> terms to which the consumer will be bound; and (2) the consumer takes some
> action, such as clicking a button or checking a box, that unambiguously manifests
> his or her assent to those terms.

*Berman*, 30 F.4th at 856 (applying California law).

To establish that Plaintiff had constructive, or inquiry, notice of the Terms of Use Agreement, Defendant must first show that the website "provides reasonably conspicuous notice of the terms to which the consumer will be bound[.]" Berman, 30 F.4th at 856. In this context, to be conspicuous, "a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Id.* The Court looks to "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design" in determining "whether a reasonably prudent user would have inquiry notice." *Nguyen*, 763 F.3d at 1177. Next, Defendant must also show that Plaintiff unambiguously manifested his assent to be bound by the Terms of Use Agreement. *Berman*, 30 F.4th at 857. "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Id.* (citation omitted). "[T]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858.

Here, Plaintiff received the following disclosure in bolded text immediately above the "Create Your Account" button when creating his account: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement . . . ." (ECF No. 17-2 at 6.) The phrase "Terms of Use Agreement" in the disclosure was a blue hyperlink that, if clicked, would have presented Plaintiff with the full text of the Terms of Use Agreement, including the Arbitration Agreement. (*Id.*) The Court finds that the Terms of Use Agreement does not clearly constitute a browsewrap agreement because it is "not merely posted on [the] website at the bottom of the screen." *Lee v.*

*Ticketmaster LLC*, 817 F. App'x 393, 394 (9th Cir. 2020).  Rather, the Terms of Use Agreement is "somewhat like a browsewrap agreement in that the terms are only visible via a hyperlink, but also somewhat like a clickwrap agreement in that the user must do something else—click ["Create Your Account"]—to assent to the hyperlinked terms."  *DeVries v. Experian Info. Sols., Inc.*, No. 16-cv-02953-WHO, 2017 WL 733096, at *5 (N.D. Cal. Feb. 24, 2017) (citation omitted).

The Court finds that a reasonable user would have inquiry notice because he would be able to locate the Terms of Use Agreement via the hyperlink.  The notice is conspicuously displayed directly above the "Create Your Account" button and is in regular sized, bold font.  The language "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement" clearly notes "that continued use will act as a manifestation of the user's intent to be bound."  *See Nguyen*, 763 F.3d at 1177.  Furthermore, the "Terms of Use Agreement" hyperlink is "conspicuously distinguished from the surrounding text in bright blue font, making its presence readily apparent."  *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023).  Although Plaintiff was not required to check a separate box to indicate his assent, Defendant provided the terms of use adjacent to the "Create Your Account" button, included a hyperlink to the terms in a contrasting color, and informed the user that "Create Your Account" would indicate assent to the terms.  Based on these features, the Court finds that the website design provides constructive notice of the Terms of Use Agreement.  *DeVries*, 2017 WL 733096, at *6 (finding that the website design provided constructive notice where "[t]he text containing the Terms and Conditions hyperlink was located directly above that button and indicated that clicking 'Submit Secure Purchase' constituted acceptance of those terms").

Defendant contends that numerous courts, under the same or analogous facts, have found that website users were bound by the Terms of Use Agreement when a user is required to affirmatively acknowledge the agreement before proceeding with use of the website.  (ECF No. 17-1 at 11.)  Indeed, two California district courts, including this one, have considered the issue based on the very same website as involved in this case and held that the website's features provided constructive notice of the terms.  *See Capps v. JP Morgan Chase Bank N.A.*, No. 2:22-cv-00806-DAD-JDP, 2023 WL 3030990, at *4 (E.D. Cal. Apr. 21, 2023); *Rodriguez v. Experian Servs. Corp.*,

No. 15-cv-3553-R, 2015 WL 12656919, at *2 (C.D. Cal. Oct. 5, 2015).  Therefore, the Court finds that the website provided sufficient notice of the Terms of Use Agreement, which indicates a binding arbitration agreement between Plaintiff and Defendant.

In opposition, Plaintiff argues an arbitration agreement entered after an action was filed cannot be retroactively applied.  Plaintiff entered into the Arbitration Agreement with Defendant to effectuate a credit freeze after initiating this action, filed on January 17, 2023.  (ECF No. 20 at 3, 5.)  Plaintiff further contends that Defendant and/or Kroll potentially baited Plaintiff with a credit freeze to secure his assent to the agreement, which may provide for the revocation of the arbitration agreement under fraudulent inducement.  (ECF No. 20 at 10.)  To prove fraudulent inducement, Plaintiff must show "(a) a misrepresentation, false representation, concealment, or nondisclosure; (b) knowledge of falsity; (c) intent to defraud or to induce Plaintiff to enter the contract; (d) justifiable reliance; and (e) resulting damage."  *Cream v. N. Leasing Sys., Inc.*, No. 15-cv-01208-MEJ, 2015 WL 4606463, at *5 (N.D. Cal. July 31, 2015).  However, Plaintiff concedes that he lacks sufficient evidence to show fraudulent inducement and requests the Court to grant leave to take discovery on the issues.  (*Id.*)

Next, Plaintiff asserts that the Court may exercise its power to manage a class action because Defendant seeks to limit or eliminate its liability by offering Plaintiff a post-filing arbitration agreement.  (ECF No. 20 at 13.)  Plaintiff relies on *O'Connor v. Uber Techs., Inc.*, where the court refers to a Massachusetts court striking down an arbitration agreement that the defendant offered to the class members after litigation commenced.  No. C-13-3826 EMC, 2014 WL 1760314, at *2 (N.D. Cal. May 2, 2014).  Plaintiff argues that a party procuring arbitration of claims in a proposed agreement without adequate notice of a pending class action is a misleading communication, which the court may limit.  *Id.* at 7.

The Court finds that *O'Connor* is distinguishable from the instant case because Defendant is not attempting to communicate an arbitration agreement with a potential class.  Rather, Plaintiff voluntarily entered into the Arbitration Agreement to effectuate a credit freeze; Defendant is not attempting to limit its liability for potential class members.  Notably, Plaintiff had knowledge of the lawsuit that he had initiated himself, which is distinguishable from *O'Connor*.  Therefore, the

1  reasoning in *O'Connor* is inapplicable to this action and does support that the Court must order a

2  corrective notice to Plaintiff, informing him of the impact of the agreement on this class action.

3      Moreover, the arbitration agreement is retroactive.  (ECF No. 17-2 at 14-16 (explaining that

4  the arbitration agreement encompasses "claims that arose before this or any prior Agreement . .

5  .").)  The Ninth Circuit consistently upholds the enforceability of the retroactivity of arbitration

6  clauses.  *See, e.g.*, *Sanfilippo v. Match Group, LLC*, No. 20-55819, 2021 WL 4440337, at *2 (9th

7  Cir. Sept. 28, 2021) (rejecting unconscionability argument where the arbitration agreement

8  "establishe[d] an intent to cover claims that had accrued prior to the effective date of the arbitration

9  agreement"); *Trudeau v. Google LLC*, 816 Fed. Appx. 68, 70 (9th Cir. 2020) (upholding the

10  enforceability of the following clause: "This agreement to arbitrate . . . includes . . . claims that

11  arose before Customer or Advertiser first accepted any version of these Terms containing an

12  arbitration provision.").  Again, Plaintiff did not have to read the Arbitration Agreement in detail

13  to be bound by it.  *See, e.g.*, *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1225 n.4 (9th Cir. 2013)

14  (agreeing with district court's assessment that "[p]laintiffs received the Customer Agreement

15  containing the arbitration provision, and were bound by the contract, even if they did not read it");

16  *Blau v. AT & T Mobility*, No. C 11–00541 CRB, 2012 WL 10546, at *4 (N.D. Cal. Jan. 3, 2012)

17  ("It is not even relevant if Plaintiffs did not read the agreements before signing them. [Citation.]

18  Indeed, Plaintiffs never assert that they were denied an opportunity to review all of the terms to

19  which they were agreeing.")  Hence, the Court finds that the Arbitration Agreement is retroactive,

20  invalidating Plaintiff's argument.

21      Lastly, the Court notes that Plaintiff fails to cite to any authority that demonstrates his

22  entitlement to a period of discovery on this issue.  Overall, the Court finds Plaintiff's arguments

23  unavailing and continues to find that there is a binding arbitration agreement between Plaintiff and

24  Defendant.

25  ///

26  ///

27  ///

28  ///

**B. The arbitrator must decide all the issues, including the scope and enforceability of the Arbitration Agreement.**

**1. Defendant is a party to the Arbitration Agreement who may enforce it.**

Once the parties have clearly and unmistakably agreed that an arbitrator should decide the validity and applicability of an arbitration provision, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Chiron Corp v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000); *see Henry Schein, Inc.*, 139 S. Ct. at 527-30 ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.").

Preliminarily, Defendant argues that EIS, as an affiliate of ECS, may directly enforce the arbitration provision in the CreditWorks Terms of Use Agreement, citing to *Meeks v. Experian Info. Sols.*, No. 21-17023, 22-15028, 2022 WL 17958634 (9th Cir. Dec. 27, 2022). (ECF No. 17-1 at 11-13.) In *Meeks*, the court held that EIS was a party to the arbitration provision, which appears to be the same Terms of Use Agreement that is contested here, because EIS is defined as an affiliate of ECS in the arbitration agreement. *Id.* at *2. Parties defined as "affiliates" in an arbitration agreement may enforce the agreement as a party in an action. *See Ridgeway v. Nabors Completion & Prod. Servs. Co.*, 725 Fed. Appx. 472, 475 (9th Cir. 2018); *Belyea v. GreenSky, Inc.*, No. 20-cv-01693-JSC, 2021 WL 1338552, at *3 (N.D. Cal. Apr. 9, 2021); *Sanzone-Ortiz v. Aetna Health of Cal.*, No. 15-cv-03334-WHO, 2015 WL 9303993, at *6 (N.D. Cal. Dec. 22, 2015). At a minimum, Defendant argues that it may compel arbitration as a third-party beneficiary of the contract. (ECF No. 17-1 at 13.) Defendant asserts that the arbitrator must resolve any dispute over whether EIS qualifies as a third-party beneficiary.[2] (ECF No. 17-1 at 14.) Overall, Defendant argues that it may

---

[2] A third party may assert rights under a contract when (1) "the third party would in fact benefit from the contract," (2) "a motivating purpose of the contract was to provide a benefit to the third party," and (3) "permitting [the] third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties." *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 830 (2019); *see also Hacochen v. BMW of N. Am. LLC*, No. CV 21-0464-MWF (JEMx), 2021 WL 4352364, at *4 (C.D. Cal. July 23, 2021) (applying the test to compel arbitration with a third-party beneficiary).

Because EIS is an affiliate of the arbitration agreement, Defendant contends that EIS would benefit from the contract as a third-party beneficiary, including the right to arbitrate claims against it pursuant to the contract's express

1  directly enforce the arbitration agreement against Plaintiff, and that the arbitrator should have the

2  exclusive authority to resolve any dispute relating to the scope and enforceability of the arbitration

3  provision.  (*Id.*)

4       In opposition, Plaintiff argues that Defendant does not have standing to enforce the

5  agreement because it is not a party to the agreement and Defendant's interpretation of "affiliates"

6  is overbroad.  (ECF No. 20 at 11-12.)  Plaintiff further contends that his claims against Defendant

7  do not arise from the Arbitration Agreement with Defendant.  (*Id.* at 6.)  Plaintiff particularly

8  attempts to undermine Defendant's reliance on *Meeks*.  Plaintiff argues that *Meeks* is

9  distinguishable from this action because the court did not consider whether the dispute arose out of

10  the agreement.  *Meeks*, 2022 WL 17958634, at *2 n.3.  However, such inquiry is not required

11  because the agreement in *Meeks* delegates issues of scope to the arbitrator to decide and a court

12  may not override the contract.  *Id.*

13       The Court acknowledges that Plaintiff has not identified any legal authority that supports

14  his interpretation of "affiliates."  Plaintiff also does not provide any compelling reasons why the

15  Court should not follow the Ninth Circuit's decision in *Meeks*, 2022 WL 17958634, at *2.  Hence,

16  the Court finds Plaintiff's arguments unavailing.  Like the courts in the above-cited decisions, this

17  Court finds that Defendant presents sufficient evidence to establish that Defendant is an affiliate of

18  ECS during the time that Plaintiff was enrolled in CreditWorks.  *See Ridgeway*, 725 Fed. Appx. at

19  475; *Belyea*, 2021 WL 1338552, at *3; *Sanzone-Ortiz*, 2015 WL 9303993, at *6.  For these reasons,

20  the Court concludes that Defendant was a part of the Arbitration Agreement.  *See Meeks*, 2022 WL

21

22  provisions.  *See Hacochen*, 2021 WL 4352364, at *5 (holding that an arbitration agreement allowing enforcement by
   affiliates indicates that affiliate's benefit from the contract).  Second, Defendant argues that by naming EIS as a party
23  that may enforce the arbitration agreement, the parties expressed a motivating purpose to provide a benefit to EIS.
   (ECF No. 17-1 at 17.)  Third, Defendant argues that allowing EIS to enforce the arbitration agreement is consistent
24  with the objectives of the contract and the reasonable expectations of the contracting parties, as EIS is not some random
   third party.  (*Id.*)  Therefore, Defendant requests that the Court find EIS as a third-party beneficiary who may compel
25  this action to arbitration.

26  The dispute as to whether Defendant is a third-party beneficiary is determined by the arbitrator.  *See Sauer v. Experian
   Info. Sols.*, No. 8:21-cv-00963-JLS-DFM, 2022 WL 2163016, at *3 (C.D. Cal. May 12, 2022) (holding that the dispute
27  over whether Experian is a third-party beneficiary should go to the arbitrator); *see also Portland Gen. Elec. Co. v.
   Liberty Mut. Ins. Co.*, 862 F.3d 981, 983-84 (9th Cir. 2017) (holding that the question of whether a third party can
28  arbitrate a claim based on an arbitration clause is a question about the scope of the arbitration clause for the arbitrator
   to decide).

1  17958634, at *2.

2      **2. The question regarding the scope of the Arbitration Agreement has been**

3           **delegated to the arbitrator.**

4      Defendant argues that the arbitrator must decide whether Plaintiff's claims fall within the

5  scope of the arbitration agreement.  (ECF No. 17-1 at 18.)  On the other hand, Plaintiff argues that

6  there is no issue of arbitrability for the arbitrator to decide because the dispute did not arise out of

7  the contract.  (ECF No. 20 at 9.)

8      The Arbitration Agreement provides that, "[a]ll issues are for the arbitrator to decide,

9  including the scope and enforceability of this arbitration provision as well as the Agreement's other

10  terms and conditions . . . ."  (ECF No. 17-2 at 15.)  Therefore, Defendants assert that the Terms of

11  Use of the Arbitration Agreement is an unambiguous expression of intent to arbitrate the issue of

12  arbitrability.

13      The Arbitration Agreement provides:

14           All issues are for the arbitrator to decide, including the scope and enforceability

15           of this arbitration provision as well as the Agreement's other terms and

16           conditions, and the arbitrator shall have exclusive authority to resolve any such

17           dispute relating to the scope and enforceability of this arbitration provision or

18           any other term of this Agreement . . . .

19  (ECF No. 17-2 at 14-16.)  Also, the Arbitration Agreement expressly incorporates the Commercial

20  Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes

21  ("AAA rules").  (*Id.* at 4, 15.); *see Eckert/Wordell Architects, Inc. v. FJM Props. Of Willmar,* LLC,

22  756 F.3d 1098, 1100 (8th Cir. 2014) (holding that incorporation of the AAA rules into a contract

23  requiring arbitration is a clear and unmistakable indication that the parties intended for the arbitrator

24  to decide threshold questions of arbitrability).  Accordingly, the Court concludes that Plaintiff and

25  Defendant have clearly and unmistakably delegated the question regarding the scope of the

26  Arbitration Agreement to the arbitrator.  *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir.

27  2015); *see also Stephens v. Experian Info. Sols., Inc.*, 614 F. Supp. 3d 735, 743 (D. Haw. 2022)

28  (concluding that "the parties have clearly and unmistakably delegated the issue of arbitrability to

the arbitrator" where the arbitration agreement contained identical delegation language and incorporated the AAA rules); *Solis v. Experian Info. Sols., Inc.*, No. 22-cv-00102-CJC-KES, 2022 WL 4376077, at *2 (C.D. Cal. Sept. 21, 2022) (finding that the arbitrator must decide "scope" issues where the arbitration agreement contained identical delegation language); *Capps*, 2023 WL 3030990, at *6.

Consequently, the Court cannot consider whether Plaintiff's disputes arise out of or relate to the arbitration agreement because that is a question for the arbitrator to decide.  *See Meeks*, 2022 WL 17958634, at *2 n.3 ("We do not address the plaintiffs' argument that Experian cannot enforce the provision because the dispute does not arise out of the agreement.  The agreement delegates issues of scope to the arbitrator to decide.")  Therefore, the Court holds that the Arbitration Agreement has a valid delegation clause, and the arbitrator must decide any question regarding the scope of the Arbitration Agreement.

**D. The action must be stayed pending arbitration.**

Section 3 of the FAA expressly provides that the Court "shall . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3. Here, the Court stays this action pending completion of arbitration.

## CONCLUSION

Accordingly,

1. Defendant's motion to compel arbitration, (ECF No. 17), is granted;

    a. Plaintiffs' claims against Defendant are stayed pending the completion of arbitration;

2. Plaintiff and Defendant are required to notify the Court that arbitration proceedings have concluded within fourteen (14) days of the issuance of the arbitrator's decision; and

///

///

///

///

///

3.  Because all claims in this action are now stayed pending the completion of arbitration, all dates currently on the calendar in this case are vacated.

IT IS SO ORDERED.

Dated:   July 24, 2023

_____
UNITED STATES DISTRICT JUDGE

16